George W. BUSH and Richard Cheney, Candidates for the Office of President and Vice President of the United States, and The Republican Party of Florida, Plaintiffs,

v.

The HILLSBOROUGH COUNTY CANVASSING BOARD, et al., Defendants.

No. 3:00–CV–533/LAC.

United States District Court, N.D. Florida, Pensacola Division.

Dec. 8, 2000.

Edward Fleming, McDonald Fleming etc, Pensacola, FL, for plaintiffs.

D Michael Chesser, Chesser Wingard Barr etc, Shalimar, FL, for Okaloosa County, The Okaloosa County Canvassing Bd.

Danield L Dwyer, Greenfelder Mander Murphy Dwyer & Morris, Dade City, FL, for the Pasco County Canvassing Bd.

## DECLARATORY JUDGMENT

COLLIER, District Judge.

THIS CAUSE comes before the Court on Plaintiffs' complaint for declaratory and injunctive relief filed November 26, 2000 (doc. 1). Plaintiffs George W. Bush, Richard Cheney, and the Republican Party of Florida allege that the Defendant Canvassing Boards in Hillsborough, Okaloosa, Orange, Pasco, Polk, Collier, and Walton Counties rejected overseas absentee state ballots and federal write-in ballots based on criteria inconsistent with federal law and request the Court to declare that the ballots are valid and should be counted.[1] On December 1, 2000, Plaintiffs filed a motion for an expedited hearing of the matter (doc. 5). Pursuant to this Court's order, the parties were directed to submit all briefs, documentary evidence, and stipulations by 4:00 p.m. on December 4, 2000 and to appear before the Court for a hearing on December 5, 2000 (doc. 4).[2] Upon review of the affidavits and exhibits submitted by the parties and for the reasons stated below, the Court enters Declaratory Judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure and Title 28, United States Code, Section 2201.

### I. STATEMENT OF THE CASE

In the months and weeks leading up to the 2000 Presidential Election, incessant media polling foreshadowed the almost even split of opinion of American voters. However, no one could have predicted the recent events unfolding in Florida and the scrutiny that the State's election proce-dures would endure. Although frustrating at times, it is important to remember that with such focused attention comes the catalyst for legislative reform.

The Florida election procedures involved in this case are those affecting overseas citizens' ability to vote by state absentee or federal write-in ballot. Specifically, the issue is whether the criteria used by Defendant Canvassing Boards to reject overseas state absentee and federal write-in ballots conflicts with, and is preempted by, existing federal law—the Uniformed and Overseas Citizens Absentee Voting Act, Pub.L. No. 99–410, 100 Stat. 924 (1986). Collectively, Defendants rejected ballots that arrived without a postmark, with an illegible postmark, or with a postmark dated after election day if there was no handwritten date on the envelope to suggest that the vote was cast before November 7, 2000.[3] See FLA.ADMIN.CODE § 1S–2.013(7) (2000). Because Florida extends the deadline for receiving absentee ballots only to those submitted from overseas, Defendant Hillsborough County Canvassing Board rejected state absentee and federal write-in ballots received after election day with a U.S. postmark rather than an APO, FPO, or foreign postmark. See FLA.STAT.ANN. § 101.62(7)(c) (West Supp.2000). Defendant Polk County Canvassing Board rejected an overseas state absentee ballot because the signature on the voter's certificate did not match the signature in the Board's registration records.[4] See id. § 101.68(1)(c). Lastly, based on their interpretation of the Uniformed and Over-

1. Count III of Plaintiffs' complaint also requests injunctive relief ordering Defendants to recount the previously rejected ballots and to submit the amended totals to Florida's Secretary of State. Plaintiffs have since withdrawn the request as moot (doc. 14). Plaintiffs have also voluntarily dismissed Defendants Pasco and Walton County Canvassing Boards as well as the individual Defendants of those boards.

2. Defendant Orange County Canvassing Board failed to answer Plaintiffs' complaint or respond in any way to this Court's order. Because of the extremely important nature of the issues presented here, the Court is disap-pointed with Orange County's failure to participate.

3. Notwithstanding the prerequisite that the envelope be postmarked or signed and dated no later than the date of the election, Defendants' instructions do not inform the voter of this requirement.

4. Plaintiffs have abandoned their request for declaratory relief addressing this particular issue. Notwithstanding, the Court is compelled to comment on the reports that absentee votes were rejected because of minor differences in the signature on the envelope and the registration records, including instances

seas Citizens Absentee Voting Act, Defendants rejected federal write-in ballots if they had no record of a prior application for a state absentee ballot. *See* 42 U.S.C.A. §§ 1973ff-1, 1973ff-2 (West 1994).[5]

Despite initial inferences to the contrary, there has been no evidence presented to the Court that Defendants rejected overseas state absentee or federal write-in ballots because of their individual political positions or because they were influenced by advocates for either political party. As in any election, the fact that opposing parties offered their opinions as to the validity of certain votes does little to prove that the county canvassing boards were persuaded. The only indication is that Defendant Canvassing Boards performed their duties with the best of intentions and attempted to comply with both state and federal law. The issue is whether they were successful regarding the latter.

## II. Discussion

### A. Federal Law

Voting is a right, not a privilege, and a sacred element of the democratic process. For our citizens overseas, voting by absentee ballot may be the only practical means to exercise that right. For the members of our military, the absentee ballot is a cherished mechanism to voice their political opinion. Trained as a team, they do not enjoy the individualism which they serve to defend for all other citizens. How and where they conduct their lives is dic-

tated by the government. The vote is their last vestige of expression and should be provided no matter what their location.

### 1. The Federal Voting Assistance Act of 1955

In recognition of a citizen's right to vote, Congress enacted the Federal Voting Assistance Act of 1955 (FVAA), ch. 656, 69 Stat. 584 (repealed 1986). The FVAA was designed to prevent members of the Armed Forces and their families from being denied the right to exercise their voting franchise when absent from their home or in a far-off place. *See* H.R.Rep. No. 1385 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2067, 2068; S.Rep. No. 1025 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2064, 2065; S.Rep. No. 580 (1955), *reprinted in* 1955 U.S.C.C.A.N. 2777, 2779. The goal was to make it easier for military personnel to cast votes in any primary, general, or special election through absentee balloting procedures.[6] *See* S.Rep. No. 1025, 1968 U.S.C.C.A.N. at 2065; S.Rep. No. 580, 1955 U.S.C.C.A.N. at 2779. With this underlying principle in mind, Congress made several recommendations to the States. For example, the FVAA recommended that each State: (1) accept a state absentee ballot application as an application "for registration under such States' election laws"; (2) waive registration of individuals covered under the Act "who, by reason of their service, have been deprived of an opportunity to register"; (3) accept a federal post card application

---

where a middle or first initial was used on the ballot rather than the complete name as indicated on the records. Although the Court recognizes a state's interests in preventing fraud and the necessity of vesting a certain degree of discretion with local canvassing boards, such a practice is unacceptable.

5. Although the Court has only considered the actions of the canvassing boards named as Defendants in making its ruling, the Court notes that evidence submitted by Plaintiffs suggests other county canvassing boards used similar criteria to reject overseas ballots.

6. The Committee on Rules and Administration stated:

Service personnel give up many things when they enter the military, including the free exercise of some civil rights enjoyed by civilians at home. The sacrifice should not go beyond the surrender of rights that are incompatible with military duties. These men and women of our Armed Forces should be able to expect as much and no less, because of their induction into military service, than those of us who remain at home pursuing normal activities. It certainly would appear unnecessary that our soldiers and sailors and merchant marines must make a special effort to retain the right to vote.

S.Rep. No. 580, 1955 U.S.C.C.A.N. at 2779.

"as a simultaneous application for registration and for ballot"; and (4) "authorize and instruct ... election officials, upon receipt of the [federal] post card application ... to mail immediately to the applicant a ballot, instructions for voting and returning the ballot, and a self-addressed envelope." Federal Voting Assistance Act § 102, 69 Stat. at 584–85. To ensure that military personnel had easy access to suffrage, the FVAA required all balloting materials, "whether transmitted individually or in bulk," be shipped in the U .S. postal system free of postage. *Id.* § 302, 69 Stat. at 588. The FVAA also provided safeguards to prevent an absentee ballot from being invalidated. *See* S.REP. No. 580, 1955 U.S.C.C.A.N. at 2779; *see also* Federal Voting Assistance Act §§ 303–305, 69 Stat. at 588–89.

By 1968, every State, through either legislative or administrative action, permitted members of the Armed Forces to register and vote in elections pursuant to an absentee-ballot procedure. *See* H.R.REP. No. 1025, 1968 U.S.C.C.A.N. at 2068–69; S.REP. No. 1025, 1968 U.S.C.C.A.N. at 2065. However, civilian citizens residing abroad were not so fortunate. Congress, in an effort to expand the category of individuals covered under the Act, amended the FVAA so it would include U.S. citizens "temporarily residing abroad and engaged in business, the professions, teaching, the arts, and other walks of life." S.REP. No. 1025, 1968 U.S.C.C.A.N. at 2065; *see also* Act of June 18, 1968, Pub.L.

No. 90–343, 82 Stat. 180, 180–81 (repealed 1986). Unfortunately, not every State responded with swift election-law reform as Congress had expected. Only twenty-eight States and the District of Columbia enacted statutes "expressly allowing absentee registration and voting in Federal elections for citizens 'temporarily residing' outside the United States." H.R.REP. No. 94–649, at 2 (1975), *reprinted in* 1975 U.S.C.C.A.N. 2358, 2359. The remaining States, however, had not done so. In fact, every State, including the District of Columbia, insisted on strict residency requirements that many private citizens overseas could not meet. *See* H.R.REP. No. 94–649, at 3, 1975 U.S.C.C.A.N. at 2360.

## 2. The Overseas Citizens Voting Rights Act of 1975

Congress responded to this discriminatory treatment by enacting the Overseas Citizens Voting Rights Act of 1975 (OCVRA), Pub.L. No. 94–203, 89 Stat. 1142 (repealed 1986). The primary purpose of this Act was to "assure the right of otherwise qualified private U.S. citizens residing outside the United States to vote in Federal elections." H.R.REP. No. 94–649, at 1, 1975 U.S.C.C.A.N. at 2358. It was designed to eliminate the unreasonable residency requirements imposed by the remaining twenty-two States. Thus, the Act made the right to register and vote absentee in Federal elections mandatory, leaving the details to the States.[7]

---

7. Section 3 of the OCVRA provided: "Each citizen residing outside the United States *shall* have the right to register absentee for, and to vote by, an absentee ballot in any Federal election in the State...." Overseas Citizens Voting Rights Act § 3, 89 Stat. at 1142 (emphasis added). Section 4 stated

   (a) Each State *shall* provide by law for the absentee registration or other means of absentee qualification of all citizens residing outside the United States and entitled to vote in a Federal election in such State pursuant to section 3....

   (b) Each State *shall* provide by law for the casting of absentee ballots for Federal elections by all citizens residing outside the United States who—

(1) are entitled to vote in such State pursuant to section 3;

(2) have registered or otherwise qualified to vote under subsection (a); and

(3) have returned such ballots to the appropriate election official of such State in sufficient time so that such ballot is received by such election official not later than the time of closing of the polls in such State on the day of such election.

*Id.* § 4, 89 Stat. at 1143 (emphasis added). Interestingly, the language in § 4 explicitly recognized that any absentee ballot cast by a voter must have been received before the polls closed on election day. There is absolutely no mention of postmarks in the statutory language or legislative history because

The overall theme of the OCVRA, like the FVAA, was to reenfranchise citizens residing overseas through the adoption, by the several States, of uniform and simplified absentee voting registration procedures. The OCVRA did not prevent States "from adopting or following any voting practice which [was] less restrictive than the practices proscribed by [the] Act." [8] *Id.* § 7, 89 Stat. at 1144.

In 1978, Congress amended the FVAA and the OCVRA to improve the administration and operation of the Acts, to make them consistent with each other, and, once again, to remedy problems faced by U.S. citizens residing abroad because they were denied their "constitutional right to vote" or were "inhibited from doing so" due to "inconsistent and conflicting laws and other impediments imposed by the several States." H.R.REP. No. 95–1568, at 2 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5759, 5760; *see also* Act approved Nov. 4, 1978, Pub.L. No. 95–593, 92 Stat. 2535 (repealed 1986). The Committee on House Administration noted several deficiencies, including the fact that State laws were not uniform and the existence of substantial disparities "as to filing requirements and deadlines, the right to register and vote absentee, and other provisions relating to

---

there was no need for postmarks. With regard to the potential for fraud, the Committee on House Administration stated:

> The committee has concluded that the potential of voting fraud in the implementation of the bill is remote and speculative. The bill imposes a $5,000 fine and 5 years' imprisonment for willfully giving false information for purposes of absentee registration and voting under the mechanisms set forth in the legislation.
>
> The Federal Voting Assistance Task Force of the Department of Defense has not reported a single case of voting fraud in the entire 20 years that absentee registration and voting by private U.S. citizens overseas that been [sic] recommended to the States by Congress.
>
> The States would still be free under this bill to establish further safeguards against fraud. Many of the States, for example, already require notarization by a U.S. official of at least one absentee voting document. The absentee voter often is required to go down to the U.S. consulate or other local American official with his passport and have his application for registration notarized. If the State does not also treat the registration request as an application for absentee ballot, the voter may be obliged to have another form notarized requesting the ballot. And if the State also requires notarization on the ballot, the voter may have to visit the U.S. consulate once again for this purpose.

H.R.REP. No. 94–649, at 4, 1975 U.S.C.C.A.N. at 2361. Thus, States were permitted to establish additional safeguards against fraud such as requiring documents to be notarized.

**8.** This section established that the standards contained within the OCVRA were the maximum restrictions States were permitted to require when enacting legislation allowing absentee registration and voting in Federal elections by citizens temporarily residing overseas. The Committee on House Administration opined that the OCVRA was constitutional. It stated:

> The committee is of the view, based upon opinions submitted in the hearings, that the act would be upheld if subjected to constitutional challenge in the U.S. Supreme Court. The committee recognizes the principles that the right to vote for national officers is an inherent right and privilege of national citizenship, and that Congress retains the power to protect this right and privilege under both the necessary and proper clause and the 14th amendment.
>
> . . . .
>
> . . . American citizens outside the United States . . . have their own Federal stake—their own U.S. legislative and administrative interests—which may be protected only through representation in Congress and in the executive branch. The fact that these interests may not completely overlap with those of citizens residing within the State does not make them any less deserving of constitutional protection. The President and Congress are concerned with the common interests of the entire Nation, along with the specific concerns of each State and district.
>
> . . . .
>
> . . . As Justice Stewart said in *Oregon v. Mitchell*, 400 U.S. at 292, 91 S.Ct. 260, "The power of the States with regard to the franchise is subject to the power of the Federal Government to vindicate the unconditional personal rights secured to the citizen by the Federal Constitution."

H.R.REP. No. 94–649, at 5, 7, 1975 U.S.C.C.A.N. at 2362, 2364 (footnote omitted).

absentee voting by persons covered under the FVAA." [9] H.R.Rep. No. 95–1568, at 2, 1978 U.S.C.C.A.N. at 5760.

### 3. The Uninformed and Overseas Citizens Absentee Voting Act

Despite great efforts and significant advances made by the several States to ensure that military and overseas voters were not disenfranchised,[10] Congress acknowledged that there was a legitimate need or further legislation. Overseas voters continued to be disenfranchised because most States failed to provide adequate time in which balloting materials could be sent to voters and returned to election·officials in time to be cast as a valid vote.[11] *See* H.R.Rep. No. 99–765, at 10–13, 1986 U.S.C.C.A.N. at 2014–17. To combat this specific problem, which was mainly due to a poor and slow overseas-mail-delivery system, Congress ·enacted the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Pub.L. No. 99–410, 100 Stat. 924 (1986) (codified as amended at 18 U.S.C. §§ 608–609, 39 U.S.C. § 3406, and 42 U.S.C. §§ 1973ff to 1973ff–6). The Act's primary purpose was to facilitate absentee voting and to provide "for a write-in absentee ballot that may be used in Federal general elections by overseas voters who, *through no fault of their own,* fail to receive a regular [State] absentee ballot in sufficient time to vote and

**9.** Some of the more notable amendments affirmed the need to have absentee balloting materials shipped to the United States free of postage and by the most expedited means available. *See* H.R.Rep. No. 95–1568, at 3–5, 1978 U.S.C.C.A.N. at 5761–63; *see also* Act approved Nov. 4, 1978 §§ 4, 9, 92 Stat. at 2535–38. The Postmaster General was encouraged to "[f]acilitate the transmission of voting materials by" using "special bags and special tags to segregate voting material." H.R.Rep. No. 95–1568, at 5, 1978 U.S.C.C.A.N. at 5763.

**10.** For example, all States permitted absentee voting in every election for individuals covered by the FVAA and OCVRA, most States permitted an elector to register to vote through use of the federal post card application, and some "States *accept[ed] absentee ballots, particularly those from overseas, for a specified manner of days after election day.*" H.R.Rep. No. 99–765, at 8 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2009, 2012 (emphasis added).

**11.** The timely receipt of absentee ballots was the main concern. In House Report 99–765, the Committee on House Administration stated:

In the last election, 1984, thousands of military and overseas voters attempted to vote but were unable to do so simply because their ballots arrived *either too late or not at all.* Based on surveys conducted by the Federal Voting Assistance problem, approximately 8.4% of military voters, 7.8% of federal civilians, and 5% of other civilians, tried but were unable to vote for this reason. That is a total of approximately 400,-000 citizens.

This number does not include those voters who submitted a ballot but were unaware that it was received too late by election officials to be counted. Tony Sirvello, testifying on behalf of Anita Rodeheaver, Clerk of Harris County, Texas, commented that: "In 1984 we mailed approximately 12,000 ballots to overseas voters. Of that number, we received back 9,500 in time to be counted.... Of the remaining number, 350 were returned too late to be counted...."

The total also does not include the many others who may have been discouraged from even making the attempt to vote because of past difficulties. As C.R. Jackson of the Non Commissioned Officers Association pointed out in hearing testimony, if ballots do not come, it not only disenfranchises the specific voters who failed to receive them, it undermines efforts to get people to register and vote to begin with. H.R.Rep. No. 99–765, at 10, 1986 U.S.C.C.A.N. at 2014 (emphasis added). The Committee concluded by stating:

When overseas voters fail to receive their absentee ballots in time to vote and return them, they are clearly and effectively disenfranchised. Whether State procedures are not conductive to providing adequate transit time, or whether ballots are mailed late despite the best efforts of everyone involved, in either case the effect—disenfranchisement—is the same.

. . . .

A ... solution ... is to ensure that affected voters—those whose absentee ballots are not mailed in a timely manner—nonetheless have an opportunity to vote.

*Id.* at 12–13, 1986 U.S.C.C.A.N. at 2016–17.

return the ballot prior to the voting deadline in their State." H.R.REP. No. 99–765, at 5, 1986 U.S.C.C.A.N. at 2009 (emphasis added). The secondary purpose was to update and consolidate the provisions contained within the FVAA and the OCVRA.[12] Consequently, the FVAA and the OCVRA were repealed.

Under the UOCAVA, an "absent uniformed services voter" means:

(A) a member of a uniformed service on active duty who, by reason of such active duty, is absent from the place of residence where the member is otherwise qualified to vote;

(B) a member of the merchant marine who, by reason of service in the merchant marine, is absent from the place of residence where the member is otherwise qualified to vote; and

(C) a spouse or dependent of a member referred to in subparagraph (A) or (B) who, by reason of the active duty or service of the member, is absent from the place of residence where the spouse or dependent is otherwise qualified to vote;

42 U.S.C.A. § 1973ff–6(1) (West 1994). An "overseas voter" means:

(A) an absent uniformed services voter who, by reason of active duty or service is absent from the United States on the date of the election involved;

(B) a person who resides outside the United States and is qualified to vote in the last place in which the person was domiciled before leaving the United States; or

(C) a person who resides outside the United States and (but for such residence) would be qualified to vote in the last place in which the person was domiciled before leaving the United States.

*Id.* § 1973ff–6(5). With respect to all Federal elections, States must:

(1) permit absent uniformed services voters and overseas voters to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office;

(2) accept and process, with respect to any general, special, primary, or runoff election for Federal office, any otherwise valid voter registration application from an absent uniformed services voter or overseas voter, if the application is received by the appropriate State election official not less than 30 days before the election; and

(3) permit overseas voters to use Federal write-in absentee ballots (in accordance with section 1973ff–2 of this title) in general elections for Federal office.

*Id.* § 1973ff–1. A federal write-in ballot can be used by an overseas voter who timely applies for a State absentee ballot but does not receive the ballot.[13] *See id.* § 1973ff–2(a). Federal write-in ballots must "be submitted and processed in the manner provided by law for absentee ballots in the State involved." *Id.* § 1973ff–2(b). However, an overseas voter's federal write-in ballot shall not be counted—

(1) if the ballot is submitted from any location in the United States;

(2) if the application of the overseas voter for a State absentee ballot is received by the appropriate State election official

---

12. For further legislative history on the UOCAVA, see 132 CONG.REC. S11903–01 (daily ed. Aug. 15, 1986); 132 CONG.REC. 115973–03 (daily ed. Aug. 12, 1986); 132 CONG.REC. S9201–02 (daily ed. July 16, 1986); 132 CONG.REC. S7183–04 (daily ed. June 10, 1986); 132 CONG.REC. E1438–03 (daily ed. Apr. 29, 1986); 132 CONG.REC. E726–02 (daily ed. Mar. 12, 1986). This legislative history clearly establishes that Congress intended to guarantee that military personnel and overseas citizens retain their right to vote and how that right must be exercised by the absentee ballot.

13. An overseas voter can obtain a federal write-in ballot through "military bases and ships.... American embassies and consulates, and ... other locations overseas." H.R.REP. No. 99–765, at 5, 1986 U.S.C.C.A.N. at 2009. Furthermore, the ballot could only "be used in Federal general elections ... and only by overseas voters who would otherwise be disenfranchised through no fault of their own." *Id.* at 5–6, 1986 U.S.C.C.A.N. at 2009–10.

less than 30 days before the general election; or

(3) if a State absentee ballot of the overseas voter is received by the appropriate State election official not later than the deadline for receipt of the State absentee ballot under State law.

*Id.* § 1973ff–2(b). In order to maximize an absent overseas voter's access to the polls, Congress recommended that States—

(1) use the official post card form (prescribed under section 1973ff of this title) for simultaneous voter registration application and absentee ballot application;

(2) adopt the suggested design for absentee ballot mailing envelopes prescribed under section 1973ff of this title;

(3) waive registration requirements for absent uniformed services voters and overseas voters who, by reason of service or residence, do not have an opportunity to register;

(4) if an application other than an official post card form (prescribed under section 1973ff of this title) is required for absentee registration, provide that registration forms be sent with the absentee ballot and may be returned with it;

(5) expedite processing of balloting materials with respect to absent uniformed services voters and overseas voters;

(6) permit any oath required for a document under this subchapter to be administered by a commissioned officer of the Armed Forces or any official authorized to administer oaths under Federal law or the law of the State or other place where the oath is administered;

(7) assure that absentee ballots are mailed to absent uniformed services voters and overseas voters at the earliest opportunity;

(8) assist the Presidential designee in compiling statistical and other information relating to this subchapter; and

(9) provide late registration procedures for persons recently separated from the Armed Forces.

42 U.S.C.A. § 1973ff–3.

In an effort to guarantee that an absent overseas voter casts a vote and is not disenfranchised, balloting materials, whether shipped from or shipped to the United States, must "be carried expeditiously and free of postage." [14] 39 U.S.C.A. § 3406(a)(1). Balloting materials "may be mailed at a post office established outside the United States under section 406 of this title, unless such mailing is prohibited by treaty or other international agreement of the United States." [15] *Id.* § 3406(a)(2). Finally, to prevent the possibility of fraud and to preserve the integrity of the overseas absentee voting process, Congress retained the criminal provisions originally set forth in the FVAA and the OCVRA. [16]

**14.** The term "balloting materials" means "official post card forms (prescribed under section 1973ff of this title), Federal write-in absentee ballots (prescribed under section 1973ff–2 of this title), and any State balloting materials that, as determined by the Presidential designee, are essential to the carrying out of this subchapter." 42 U.S.C.A. § 1973ff–6.

**15.** Section 406 states: "The Postal Service may establish branch post offices at camps, posts, bases, or stations of the Armed Forces and at defense or other strategic installations." 39 U.S.C.A. § 406(a).

**16.** Pursuant to Title 18, United States Code, Section 608:

(a) Whoever knowingly deprives or attempts to deprive any person of a right under the Uniformed and Overseas Citizens Absentee Voting shall be fined in accordance with this title or imprisoned not more than five years, or both.

(b) Whoever knowingly gives false information for the purpose of establishing the eligibility of any person to register or vote under the Uniformed and Overseas Citizens Absentee Voting Act, or pays or offers to pay, or accepts payment for registering or voting under such Act shall be fined in accordance with this title or imprisoned not more than five years, or both.

18 U.S.C.A. § 608 (West 2000). Pursuant to § 609:

Whoever, being a commissioned, noncommissioned, warrant, or petty officer of an Armed Force, uses military authority to influence the vote of a member of the Armed Forces or to require a member of the Armed Forces to march to a polling place, or attempts to do so, shall be fined in accordance with this title or imprisoned not

## B. Florida Law

While Congress was busy enacting federal legislation protecting the right to vote for members of the Armed Forces and U.S. citizens residing abroad, the State of Florida was attempting to make sure that its citizens were afforded that same right. Title 9, Florida Statutes, Chapter 101 contains the absentee voting methods and procedures that election officials followed in the 2000 Presidential Election. Pursuant to section 101.62, the supervisor of elections (1) "may accept a request for an absentee ballot from an elector in person or in writing" and (2) "may accept a written or telephonic request for an absentee ballot from the elector, or, if directly instructed by the elector, a member of the electors immediate family, or the elector's legal guardian." FLA.STAT.ANN. § 101.62(1)(a)–(b) (West Supp.2000). Section 101.62 further provides:

(2) If a request for an absentee ballot is received after the Friday before the election by the supervisor of elections from an absent elector overseas, the supervisor shall send a notice to the elector acknowledging receipt of his or her request and notifying the elector that the ballot will not be forwarded due to insufficient time for return of the ballot by the required deadline.

(3) For each request for an absentee ballot received, the supervisor shall record the date the request was made, the date the absentee ballot was delivered or mailed, the date the ballot was received

by the supervisor, and such other information he or she may deem necessary. *Id.* § 101.62(2)–(3). If an "absent qualified elector overseas" requests an absentee ballot,[17] then the supervisor of elections shall mail a ballot not fewer than thirty-five days before the first primary election. *See id.* § 101.62(4)(a). Thereafter, the supervisor is required to send an advance absentee ballot not fewer than forty-five days before the second primary and general election. *See id.* As soon as the final absentee ballots are printed, the supervisor must then send an absentee ballot to every absent qualified elector overseas who made a request for such ballot by forwardable mail. *See id.* § 101.62(4)(b)(2). "With respect to marked ballots mailed by absent qualified electors overseas, only those ballots mailed with an APO, FPO, or foreign postmark shall be considered valid."[18] *Id.* § 101.62(7)(c).

Florida's election officials are also provided guidance by section 1S–2.013 of the Florida Administrative Code. That section defines an "overseas elector" as:

Any citizen located outside the United States on election day who is eligible to vote in elections conducted by the State of Florida pursuant to the Federal Overseas Citizens Voting Rights Act of 1975, 42 U.S.C.1973dd–1; or any citizen located outside the United States on election day who is otherwise qualified to vote under Florida law and who is a member of a protected group under the Federal

---

more than five years, or both. Nothing in this section shall prohibit free discussion of political issues or candidates for public office.
*Id.* § 609.

**17.** An "absent qualified elector overseas" means:
  1. Members of the Armed Forces while in the active service who are permanent residents of the state and are temporarily residing outside the territorial limits of the United States and the District of Columbia;
  2. Members of the Merchant Marine of the United States who are permanent residents of the state and are temporarily residing

outside the territorial limits of the United States and the District of Columbia; and
  3. Other citizens of the United States who are permanent residents of the state and are temporarily residing outside the territorial limits of the United States and the District of Columbia,
who are qualified and registered as provided by law.
FLA.STAT.ANN. § 101.62(7)(a).

**18.** As an aside, the Court notes that subsection (7) was added to section 101.62 in 1989; three years after Congress enacted the UOCAVA. *See* Act effective Jan. 1, 1990, ch. 89–338, § 28, 1989 Fla.Laws 2139, 2159–60.

Voting Assistance Act, 42 U.S.C.1973cc
... and who has submitted a timely and
proper request for an absentee ballot
and is otherwise qualified to vote under
Florida law.

FLA.ADMIN.CODE § 1S–2.013 (2000). The
supervisor of elections shall mail absentee
ballots to overseas electors at least thirty-
five days prior to the first, second, and
presidential preference primaries. *See id.*
§ 1S–2.013(4)–(5), (8). In order to deter-
mine whether an absentee ballot is valid,
the Florida Administrative Code provides:

> With respect to the presidential prefer-
> ence primary and the general election,
> any absentee ballot cast for a federal
> office by an overseas elector which is
> postmarked or signed and dated no later
> than the date of the Federal election
> shall be counted if received no later than
> 10 days from the date of the Federal
> election as long as such absentee ballot
> is otherwise proper.

*Id.* § 1S–2.013(7).

### C. Analysis

■ Clearly, Congress has directed the
States to provide a simplified procedure
for overseas citizens, military and civilian,
to register and vote absentee in federal
elections and to accept federal write-in
ballots when overseas state ballots are un-
available.[19] Despite the constitutional
right to vote and Congress' fervent desire
to facilitate it, federal law continues to
leave many of the details of overseas ab-

sentee voting procedure to the States.
The evolution of federal overseas voting
law acknowledges the valuable role that
States play in adopting the intricacies of
absentee voting procedures. However,
state procedures must be reasonable for
the congressional mandate to have any
meaning. Notwithstanding this congres-
sional restraint, any state requirement
that conflicts with the mandatory provi-
sions of the Uniformed and Overseas Citi-
zens Absentee Voting Act is preempted
and invalid.[20] *See* U.S. CONST. art. VI,
cl. 2; *Prigmore*, 356 F.Supp. at 430, 433.

### 1. Postmark or Signed and Dated

■ Plaintiffs claim that Defendants'
rejection of ballots with no postmark, an
illegible postmark, or a postmark dated
after election day conflicts with federal
law, which does not require any postmark
at all. Importantly, there is no evidence
that any Defendant rejected a ballot for
one of the above reasons if the envelope
was dated by hand, with a date preceding
or coinciding with election day. Thus, the
issue is whether Florida's requirement
that overseas ballots be postmarked *or*
signed and dated conflicts with federal law.

Plaintiffs are correct that nowhere in
the federal legislation does the require-
ment of a postmark appear. Absence of a
specific federal requirement leaves a his-
torically state-regulated field to the
States. However, Plaintiffs argue that the

---

**19.** The United States Supreme Court has con-
firmed "Congress' broad powers to regulate
federal elections and maintain a national gov-
ernment." *Prigmore v. Renfro*, 356 F.Supp.
427, 433 (N.D.Al.1972), *aff'd*, 410 U.S. 919,
93 S.Ct. 1369, 35 L.Ed.2d 582 (1973) (citing
*Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct.
260, 27 L.Ed.2d 272 (1970)); *see* U.S. CONST.
art. I, § 4, cl. 1.

**20.** Although the Court exercises great judicial
restraint to avoid the constitutional question,
any state requirement that needlessly burdens
the right to vote also risks a constitutional
challenge. The Court is mindful of the con-
troversy surrounding the issue of whether
there is a right to vote absentee. Certainly
there is no absolute right to receive an absen-

tee ballot. *See McDonald v. Bd. of Election
Comm'rs*, 394 U.S. 802, 807, 89 S.Ct. 1404,
1408, 22 L.Ed.2d 739 (1969). However, it
cannot be said that voting absentee is merely
a privilege for those members of our military
who do not have the freedom to choose their
location. *See O'Brien v. Skinner*, 414 U.S.
524, 532–33, 94 S.Ct. 740, 744–45, 38
L.Ed.2d 702 (1974) (recognizing that when a
State "is both physically preventing ...
[someone] from going to the pools and deny-
ing them alternative means of casting their
ballots ... [d]enial of absentee registration
and absentee ballots is effectively an absolute
denial of the franchise"). No government
can deploy its citizens overseas and then deny
them every opportunity to participate in the
process that determines such a policy.

spirit of the UOCAVA, as well as the directive that all "balloting materials ... shall be carried expeditiously and free of postage," indicates a specific congressional mandate that postmarks are not a requirement, with which state law must not conflict. 39 U.S.C.A. § 3406(a)(1). The legislative history provides an explanation for the conspicuous absence of a postmark requirement. When the predecessors of the UOCAVA were enacted, no State provided, nor did Congress require, a deadline for counting overseas absentee votes that extended beyond election day. *See supra* note 7. Because the previous federal statutes required that the overseas absentee vote arrive by the close of the polls on election day, there was no need for a postmark to record the date the ballot was mailed. That is, a postmark was not required to validate the ballot because the ballot would not be counted if it did not arrive before the polls closed. Florida's desire to accept more overseas absentee ballots than federal law requires certainly does not conflict with the text or spirit of the UOCAVA. *See supra* note 8. However, although there is no federal requirement that Florida advise overseas voters of the postmark or signed and dated pre-

requisite to receiving the extra ten mailing days, the fact that Florida neglects to do so is disappointing and just plain wrong. Florida's inadvertent failure defeats the State's consistent attempts to facilitate overseas voting and remedy the delay of overseas mail. The Court has the utmost confidence that Florida's legislature will quickly resolve this deficiency.[21]

### 2. APO, FPO, or Foreign Postmark

■ Plaintiffs allege that Defendant Hillsborough County Canvassing Board's rejection of overseas state absentee ballots and federal write-in ballots because they lacked an APO, FPO, or foreign postmark conflicted with federal law.[22] Clearly, any state statute that requires a foreign postmark on a federal write-in ballot conflicts with the UOCAVA. The language of the federal statute unequivocally mandates that states must permit the use of the federal write-in ballot by overseas voters. See 42 U.S.C.A. § 1973ff–1(3) (West 1994). The text commands that the "Presidential designee shall prescribe a Federal write-in absentee ballot (including a secrecy envelope and mailing envelope for such ballot) for use in general elections for Federal

---

21. Plaintiffs argue that Defendants' failure to provide overseas voters with *notice* of the postmark or signed and dated requirement conflicts with federal case law and cite *Griffin v. Burns*, 570 F.2d 1065 (1st Cir.1978). Nowhere does any federal voting statute require that a State provide certain instructions. At the hearing, Plaintiffs were adamant that this case involved federal statutes and that theirs was not a constitutional challenge, obviously cognizant of the heavy burden they would have to overcome to defeat Florida's election procedure on constitutional grounds. However, *Griffin* is clearly a case that turned on due process. *Id.* at 1078–79. The court held that absentee and shut-in voters' constitutional rights had been violated because the State provided them with absentee ballots in an election where absentee ballots were not a lawful means to vote. *Id.* at 1074. Although the Court refrains from reaching the constitutional question, the Court notes that unlike Plaintiffs in this case, the *Griffin* absentee voters were persuaded by the State to vote absentee instead of in person and were effectively disenfranchised. *Id.*

22. Inasmuch as a State requires an APO, FPO, or foreign postmark to accept an overseas state absentee ballot that arrives after election day, the Court reluctantly adopts the previous discussion relating to the postmark or signed and dated requirement. Similarly, Florida must have a way to assess that the ballot came from overseas so that the extra ten day window applies. No federal statute requires that the states accept overseas ballots beyond election day. Therefore, Florida's decision to accommodate only overseas voters should be encouraged. There is no evidence that any of the Defendants categorically rejected an overseas state ballot because it did not have an APO, FPO, or foreign postmark where there were other indicia that the ballot came from overseas. However, even if that were the case, it would be a matter for the State. The Court strongly suggests that section 101.62(7)(c), Florida Statutes, be clarified so that it only pertains to ballots received after the election day consistent with section 1S–2.013(7).

office." [23]   *Id.* § 1973ff–2;   *see also id.* § 1973ff(b).

The only exclusion immediately relevant is that the ballot shall not be counted "if the ballot is submitted from any location in the United States." *Id.* § 1973ff–2(b)(1). However, consistent with the UOCAVA, the federal write-in ballot lists several oaths to which the overseas absentee voter must "swear or affirm, under the penalty of perjury." Importantly, the voter must sign an oath that "I have mailed this ballot from outside the United States." The ballot regulated by the designee also provides instructions to state election officials, which specifically directs them to "examine the voter's declarations." Thus, the UO-CAVA demands that the states permit the use of federal write-in ballots and provides the mechanism to determine if they were submitted from outside the United States. Any state statute that requires its election officials to disregard the oath provided on the ballot, by requiring an APO, FPO, or foreign postmark, conflicts with federal law.[24] Also noteworthy is Congress' choice of words. The UOCAVA only requires that federal write-in ballots be "submitted," rather than mailed, from a location outside the United States. While a *mailed* ballot would likely receive a postmark, a *submitted* ballot could encompass a wide range of methods of delivery that would not. This language is consistent with the overall spirit of the UOCAVA, which is to recognize the unique circumstances of voting from overseas and facilitate it as much as possible.

### 3. No Record of Application

██  Nearly every Defendant rejected federal write-in ballots because they had no record of a prior application for a state absentee ballot, conflicting with federal law. It appears quite obvious that the UOCAVA requires that a federal write-in ballot "shall not be counted ... if the application of the overseas voter for a State absentee ballot is *received* by the appropriate State election official less than 30 days before the general election." [25]  42 U.S.C.A. § 1973ff–2(b)(2) (emphasis added). By contrast, the issue here is what the UOCAVA requires when nothing has been received by election officials.

The UOCAVA demands that the states allow overseas voters "who make timely application for, and do not receive, States absentee ballots" to use the federal write-in ballot. *Id.* § 1973ff–2(a). Thus, the federal statute merely requires that the overseas citizen submit an application, not that the state election official receive it. As discussed above, the primary purpose of the UOCAVA was to remedy the unreliability of the overseas mail system. *See supra* note 11. The federal write-in ballot was meant to provide a mechanism for overseas citizens to vote if they were unable to obtain a state absentee ballot. *See* H.R.Rep. No. 99–765, at 5, 1986 U.S.C.C.A.N. at 2009. Consistent with the congressional recognition of the problems with the mail system is the possibility that state election officials may not receive overseas applications for state absentee ballots.[26]

---

**23.**  By subsequent executive order the Secretary of Defense was named as the Presidential designee, who promptly delegated the task to the Deputy Assistant Secretary of Defense. *See* 32 C.F.R. § 46.5 (2000). Congress undeniably delegated the creation of the ballot to the executive branch, giving the designee's mandate the force of administrative law.

**24.**  Disregarding a voter's oath also conflicts with Florida's own procedure, as outlined by Okaloosa Supervisor of Elections Pat Hollarn, of allowing citizens to register to vote merely by signing an oath that they are eighteen years or older and are not a convicted felon.

**25.**  Despite the congressional certainty regarding this provision, the Court questions the logic behind insisting that the overseas voter apply for a state absentee ballot within this time frame or risk disenfranchisement. Certainly, a State can still send a state absentee ballot if an application is made within the thirty days. However, there may not be enough time for a State to send the ballot and it then be returned in time to be counted.

**26.**  Another possibility, though to the protest of Defendants, is the clerical error of the election officials.

Furthermore, the federal write-in ballot includes the oath that "I swear or affirm, under the penalty for perjury, that [m]y application for a regular state absentee ballot was mailed in time to be received 30 days prior to this election." Thus, congress has mandated that states accept federal write-in ballots if overseas citizens have timely applied and the Presidential designee has again provided the best evidence to establish proof of prior application. We must presume, without evidence to the contrary, that if the election official does not have the application on record, it is because of a problem with the overseas mail system or their own clerical error. Any state procedure that requires election officials to disregard the oath promulgated by the Presidential designee under legislative mandate, merely because they have no record of an application, conflicts with the UOCAVA.[27]

## III. DECLARATORY JUDGMENT

It is truly an unfortunate circumstance when a citizen of the United States is denied the fundamental right to vote, whether residing in one of the several States or residing overseas. It is even more unfortunate when a vote cast by a member of the Armed Forces serving abroad is rejected for no legitimate or compelling reason. The Court recognizes that much can be done to guarantee a fair election; but no matter how hard we try, regrettably we may never be able to guarantee a perfect election. Today's decision is one step closer to that goal.

The Court accepts that its role is not to legislate the intricacies of state election procedure. However, when those procedures conflict with federal law, the Court must step in. Although only certain of the criteria used by Defendants to reject federal write-in ballots directly conflicts with federal law, there is much more work to be done. The Court strongly recommends the previously mentioned areas of improvement to Florida's legislature. Similarly, the Court reminds local canvassing boards, as expressed by one of the Defendants, that their job is to accept votes, not reject them. Election officials must diligently count every vote that substantially complies with a state's election law absent any indication of fraud.

For the reasons stated above, Plaintiffs' request for declaratory relief is GRANTED in part and DENIED in part.[28] Accordingly, the Court HEREBY ORDERS that any state statute, regulation, administrative rule, or procedure that rejects a federal write-in ballot, which has been signed pursuant to the oath provided therein,

(A) *solely* because the ballot envelope does not have an APO, FPO, or foreign postmark; or

(B) *solely* because there is no record of an application for a state absentee ballot; conflicts with federal law.

---

**27.** It is unfortunate that Florida will accept an overseas absentee ballot with an unsworn handwritten date, yet questions the oath, under penalty of perjury, of many of its service men and women. Though no such evidence was presented here, the Court finds that the oath provided indirectly by Congress would also outweigh the existence of a domestic return address. The Court takes judicial notice that members of our military often provide a U.S. permanent address when stationed overseas.

**28.** The Court has carefully considered whether jurisdiction exists and whether declaratory relief is appropriate. In light of the unprece-

dented nature of events surrounding the 2000 Presidential Election in Florida, a real case or controversy exists between the parties. Furthermore, there are some very real conflicts between federal and state law that, if not interpreted correctly, could disenfranchise the men and women who fight for the very principle that our democratic society is based—the fundamental right to vote. Due to the exigent circumstances with regard to Florida's slate of presidential electors, the Court has rendered judgment in an expedited manner to ensure that the issues presented did not become moot and that the Court's judgment did not become merely an advisory opinion.

It is further ORDERED that all federal write-in ballots rejected for the above stated reasons are declared valid.