[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 11, 2001
THOMAS K. KAHN
CLERK

_____

No. 01-16902

_____

D.C. Docket No. 01-03333-CV-RWS

BYRON ASHLEY PARKER,

Petitioner-Appellant,

versus

THE STATE BOARD OF PARDONS
AND PAROLES,
WALTER RAY, Chair, State of
Georgia Board of Pardons and Paroles,
BOBBY K. WHITWORTH,
GARFIELD HAMMONDS, JR.,
DR. BETTY ANN COOK, et al.,

Respondents-Appellees.

_____

Appeal from the United States District Court for the
Northern District of Georgia

_____

(December 11, 2001)

Before EDMONDSON, CARNES and BARKETT, Circuit Judges.

PER CURIAM:

Byron Ashley Parker, scheduled to be executed at 7:00 p.m. on Tuesday, December 11, 2001, appeals the denial of his motion under Rule 65 of the Federal Rules of Civil Procedure for a temporary restraining order ("TRO"), preliminary injunction, and/or stay of execution based on his claim for declaratory relief pursuant to 42 U.S.C. § 1983. Parker's claim alleges that, as presently constituted, the Georgia Board of Pardons and Paroles (the "Board") is incapable of providing him with a clemency hearing that comports with the minimal, constitutionally-required standards of due process that attach to such proceedings. Specifically, Parker contends that three members of the five-person board are biased and therefore should be replaced, at least for purposes of his hearing. The alleged bases for the bias are:

(a)     the Chairman of the Board, Walter Ray, has stated that, "No one on death row [will] ever get clemency as long as [I am] Chairman of the Board";

(b)     Chairman Ray and Board Member Bobby Whitworth are being investigated for criminal wrongdoing by the Georgia Attorney General;

(c)     Board Member Eugene Walker has received an *ante-litem* notice of a planned sexual harassment lawsuit to be brought by his secretary, in which, pursuant to the provisions of Georgia Law, he will be represented by the Georgia Attorney General.

In his complaint, Parker disavows any allegation that any member of the Board of Pardons and Paroles is guilty of any criminal wrongdoing or unethical conduct, and specifically disavows any allegation that Chairman Ray has ever manipulated clemency votes in the past. Nonetheless, Parker argues that Chairman Ray's alleged statement about no death row inmate getting clemency is susceptible of implementation because of the unique hidden ballot voting procedures of the Board.

Under the Board's procedure, after a clemency hearing, the Members of the Board retire to their separate offices where they record their votes in private and transmit them in a sealed envelope to the Chairman. The Chairman then tallies the votes and reports whether clemency is denied or granted. The individual Board Members supposedly do not know how one another has voted and do not learn whether clemency has been granted or denied until the result of the vote is reported in the media. Because the Chairman is the only Member of the Board who knows each Member's votes and because he tallies the votes in secret, Parker argues that he is in a unique position, if so inclined, to manipulate the result of the vote without ever being discovered. Thus, Parker contends, it is especially problematic, from a due process standpoint, for the Chairman of the Board to be biased.

Parker argues that Chairman Ray and Board Member Bobby Whitworth are unable fairly to pass upon his clemency application because they are under investigation for criminal wrongdoing by the Georgia Attorney General. Parker contends that because the Georgia Attorney General is the principal advocate of his execution and because Ray and Whitworth are targets of a criminal investigation, they have an incentive to curry favor with the Attorney General by adopting the Attorney General's "position" with regard to Parker's execution. Similarly, Parker argues that because Eugene Walker will be defended by the Attorney General in the anticipated sexual harassment suit against him, Walker, too, would be inclined to rule for the "position" of the Attorney General's office against Parker's petition for clemency. We put "position" in quotation remarks because the evidence appears to be undisputed, and the district court found, that the Georgia Attorney General, as a general rule, does not appear in clemency proceedings and takes no position on whether clemency should be granted, and did not do so in this case. See Gilreath v. State Board of Pardons and Paroles, – F.3d –, 2001 WL 1471657 at *2 (11th Cir. Nov. 15, 2001).

A TRO or preliminary injunction is appropriate where the movant demonstrates that:

(a) there is a substantial likelihood of success on the merits;

4

(b) the TRO or preliminary injunction is necessary to prevent irreparable injury;

(c) the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant; and

(d) the TRO or preliminary injunction would not be averse to the public interest.

See Zardui-Quintana v. Richard, 768 F.2d 1213, 1216 (11th Cir. 1985).[1]

As to the claimed bias of Chairman Ray and Member Bobby Whitworth because they are allegedly being investigated by the Attorney General's Office for criminal wrongdoing, and as to the claimed bias of Member Eugene Walker because he is going to be sued for sexual harassment and will be represented by the Attorney General's office, Parker is unable to meet the first prong of the test. He has failed to show that there is a substantial likelihood of success on the merits of those claims. The reason is that his position in regard to those alleged biases was specifically addressed and rejected by this Court in Gilreath v. State Board of Pardons and Paroles, – F.3d –, 2001 WL 1471657 at *2 (11th Cir. Nov. 15, 2001).

---

[1]Gilreath held that similar claims brought in a § 1983 proceeding by another Georgia death row inmate amounted to a second petition which was barred because the inmate had not obtained permission to file a second petition as required by 28 U.S.C. § 2244(b)(2) & (3). However, this Court alternatively denied the claims on the merits. Ray argues that this § 1983 case is different because he brought it before the Board denied him clemency instead of afterwards, as Gilreath did. We need not decide that issue, because assuming the complaint in this case is not barred as a second petition, for the reasons we will set out  Parker still has not shown he is entitled to a TRO, a preliminary injunction, or a stay of execution.

In Gilreath we stated that:

> the district court found that no evidence showed that in Georgia the attorney general regularly advocates--or, in this case, advocated--for or against clemency and that no evidence showed that anyone familiar with Georgia's clemency procedure would believe the state attorney general's office was an advocate in the clemency proceeding. In addition, no evidence indicates what result the attorney general might have wished for this clemency proceeding. No appearance of impropriety has been established.

Id. Accordingly, there is no error in the denial of Parker's motion for a TRO or preliminary injunction on the basis of the claimed bias of Chairman Ray, Member Bobby Whitworth, and Member Eugene Walker as a result of the investigations of the first two and the possible representation of the third, by the Attorney General. Thus, Parker is not entitled to a stay of execution on this basis.

The remaining question is whether Chairman Ray's alleged statement that "No one on death row [will] ever get clemency as long as [I am] Chairman of the Board," when coupled with his unique control over the voting process as Chairman of the Board, merits any kind of relief. Parker claims that Ray made this statement over three years ago to Billy Ray Moore, a parolee whose death sentence had been commuted by the Board before Ray was on it. (According to Parker, Moore is one of six Georgia death row inmates to have his sentence commuted in the past twenty five years, and no one has ever had a death sentence commuted by a Board that includes any of the present members.) The district court granted

6

Moore's motion to quash the subpoena requiring Moore to testify regarding his conversation with Ray on grounds of Fifth Amendment privilege.[2] Chairman Ray did testify, however, denying that he ever made the statement in question. Nevertheless, the district court, while not making any factual finding, assumed for the sake of the hearing and ruling that Ray *had* made the statement in question. Ray testified, however, that he now has an open mind and listens to every clemency petition, and the district court credited that testimony. The court ruled that, assuming Ray had made the statement in question, it was something said three years ago and not in connection with this case, and Ray had stated in the instant proceeding that he would give full consideration to the clemency issues that come before him. In light of those facts, the district court concluded that Ray was not disqualified, *i.e.*, the failure to replace him in connection with Parker's clemency proceeding does not violate Parker's due process rights.

---

[2]There was no affidavit from Moore himself that Ray had made the statement. However, one or more people who were not present at the time the statement was supposedly made signed affidavits that Moore had told them Ray had made the statement to him. Two other people were actually present at the time Moore and Ray met. One was Moore's wife; the district court was told that she could not remember the specifics of the meeting. The other person present was the Board's Clemency Director, who was at the hearing in the district court but neither side called him to testify.

A stay of execution is appropriate where there is:

> a reasonable probability that four Members of the [Supreme] Court would consider the underlying issue sufficiently meritorious for the grant of certiorari or the notation of probable jurisdiction . . .; and there must be a likelihood that irreparable harm will result if that decision is not stayed.

Barefoot v. Estelle, 463 U.S. 880, 895 (1983).

Parker argues that, under Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272 (1998) (plurality opinion), the Court's most recent pronouncement on the relationship between clemency hearings and the Due Process Clause of the Fourteenth Amendment, his claims of bias entitle him to a declaration that the Board is not able to afford him a clemency hearing that comports with due process. Parker contends that the Supreme Court's opinion in Woodard demonstrates that at least four members of the Court "would consider the underlying issue sufficiently meritorious for the grant of certiorari or the notation of probable jurisdiction." Barefoot, 463 U.S. at 895.

In Woodard, the Supreme Court exercised jurisdiction over and addressed a procedural due process claim involving Ohio's clemency process. See id. at 289-90 (O'Connor, J., concurring) (addressing merits of due process challenge to clemency procedures). Although the Chief Justice, joined by Justices Kennedy, Scalia, and Thomas, concluded that the Due Process Clause provides no constitutional

safeguards with regard to clemency procedures, a majority of the Court agreed that because death-sentenced prisoners retain some life interest until execution, "some minimal procedural safeguards apply to clemency proceedings," even where the power to grant clemency is solely entrusted to the executive. Id. at 288-89 (O'Connor, J., concurring). Justice O'Connor concluded that the minimal due process safeguards that attach to clemency ensure that the procedure followed in rendering the clemency decision will not be wholly arbitrary, capricious or based upon whim, for example, flipping a coin. See Woodard, 523 U.S. at 289 (O'Connor, J., concurring). One member of the Court, Justice Stevens, stated that due process protects against the use of procedures "infected by bribery, personal or political animosity, or the deliberate fabrication of false evidence . . . ." Id. at 290-91 (Stevens, J., concurring in part and dissenting in part).

While recognizing that minimal due process guarantees do attach to clemency proceedings, the district court concluded that Chairman Ray's statement–even assuming that it was actually made –could not disqualify Ray from ever again hearing a clemency application in a capital case. The court based that conclusion on the fact that the statement, if actually made, was made approximately three years before the present date, a long enough period to allow Mr. Ray to reevaluate his position so that he could now fairly review Parker's

clemency application, and the fact (based upon his testimony which it credited)

that Ray now has an open mind and listens to all of the clemency cases that come

before him prior to voting on them. We cannot say that the district court, which

observed Ray as he testified and made a credibility determination, erred in reaching

this conclusion.[3] It follows that we cannot say the district court erred in

concluding Parker had failed to make a substantial showing of success on the

merits, nor can we say there is any reasonable probability that four members of the

Supreme Court would grant review in this case.

Accordingly, the district court's denial of Parker's motion for a TRO,

preliminary injunction, and/or stay of execution is **AFFIRMED.**

---

[3]Because the district court credited Ray's testimony about having an open mind on death sentence clemency matters, it did not feel compelled to decide what the outcome of this case would be if he had a closed mind about them. Nor do we feel compelled to address that issue.

BARKETT, Circuit Judge, specially concurring:

The district court's conclusion in this case is based on its acceptance of Chairman Ray's testimony that "I have an open mind and I listen to every one of them." Because I cannot say that the Court's acceptance of this testimony was clear error, I concur in the majority's decision. However, I am deeply troubled by the unusual nature of the court's conclusion. On the one hand, the district court assumed, for purposes of decision, that Chairman Ray made the statement that "No one on death row [will] ever get clemency as long as [I am] Chairman of the Board." But it did not so find as a fact. At the same time, the court found that Ray, who denied ever making the statement, was credible when he said that he could now entertain clemency petitions from death row inmates with an open mind. As it stands, the court has effectively assumed that Ray lied when he said he never made the initial statement, but was sincere when he said he could be neutral. It is troubling that the district court did not explore the question of Ray's openness in light of questions involving his assumed original bias.