**UNITED STATES of America,
Plaintiff,**

v.

**The State of GEORGIA; and Brian P. Kemp, Secretary of State of Georgia, in his official capacity, Defendants.**

Civil Action No. 1:12–cv–2230–SCJ.

United States District Court,
N.D. Georgia,
Atlanta Division.

July 5, 2012.

Abel Gomez, Janie Allison (Jaye) Sitton, Thomas Christian Herren, Jr., Thomas E. Perez, U.S. Department of Justice, Washington, DC, Christopher J. Huber, U.S. Attorneys Office, Atlanta, GA, for Plaintiff.

Dennis Robert Dunn, Stefan Ernst Ritter, Office of State Attorney General, Julia

B. Anderson, State of Georgia Law Department, Atlanta, GA, for Defendants.

## *ORDER*

STEVE C. JONES, District Judge.

This matter comes before the Court on the Motion for Temporary Restraining Order and Preliminary Injunction [Doc. No. 2] filed by the United States of America.

### I. Factual Background

This case concerns the State of Georgia's 2012 runoff absentee voting scheme and the federal laws that remedy the historical disenfranchisement of American citizens serving and living abroad who have been unable to vote because of logistical barriers. As this Order details, over the years, the State of Georgia has made great strides and demonstrated an honest and meritorious effort to comply with federal law and ensure that overseas voters can effectively exercise their right to vote. This is illustrated through Georgia's recent legislative enactments,[1] technological enhancements of its voting resources, and other means. The United States of America ("United States") and the State of Georgia ("Georgia") now disagree as to how federal law should be interpreted and applied to Georgia's efforts with regard to the timing and methodology of Georgia's runoff absentee voting scheme. Despite their differences of opinion, there is no doubt that both parties share the same fundamental, *and most important,* end goal of ensuring that overseas voters are able to effectively exercise their right to vote in United States elections. This order will reconcile the differences in opinion regarding the United States' pending injunctive relief request.

---

1. The 2012 legislative enactments are presently under review by the United States Department of Justice pursuant to the preclearance process of § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c(a) [Doc. No. 8, p. 4, n.1].

On June 27, 2012, the United States filed this action for declaratory and injunctive relief against the State of Georgia and its Secretary of State, Brian P. Kemp, in his official capacity, (collectively "Georgia" or "the Defendants") to enforce the right of absent uniformed services voters and overseas voters to vote by absentee ballot in Georgia's anticipated federal primary runoff election scheduled for August 21, 2012, which right is guaranteed by the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), sections 42 U.S.C. 1973ff et seq., as amended by the Military and Overseas Voter Empowerment Act, Pub. L. No. 111–84, Subtitle H, §§ 575–589, 123 Stat. 2190, 2318–2335 (2009) ("MOVE Act").

The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1973ff–4 (authorizing the Attorney General to bring a UOCAVA enforcement action for declaratory or injunctive relief) and 28 U.S.C. §§ 1345 and 2201 (providing for original jurisdiction in the district court where the United States is a plaintiff and for jurisdiction over declaratory judgment actions).[2]

The UOCAVA specifically guarantees uniformed services and overseas voters ("UOCAVA voters") the right "to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office." 42 U.S.C. § 1973ff–1. In 2009, the MOVE Act amended UOCAVA to require that "[e]ach State shall … transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter … not later than 45 days before the election. . . ." 42 U.S.C. § 1973ff–1(A)(8)(A).[3] The State of Georgia's responsibilities under UOCAVA include ensuring that validly requested absentee ballots are transmitted in accordance with the provisions of the UOCAVA. 42 U.S.C. § 1973ff–1. As Secretary of State, Brian Kemp, is Georgia's chief election officer. O.C.G.A. § 21–2–50(b).

Georgia was also the defendant in a 2004 action in which the United States alleged that UOCAVA voters from a substantial number of Georgia's 159 counties had not been mailed absentee ballots in time to receive and return them through United States postal mail for the July 20, 2004 federal primary election or the runoff on August 10, 2004. Complaint at pp. 4–5, *United States v. The State of Georgia,* No. 1:04–CV–2040–CAP (N.D.Ga. July 13, 2004). On July 16, 2004, the court entered a temporary restraining order and preliminary injunction, providing for several forms of relief [Doc. No. 2–2, pp. 12–26]. Thereafter, the Georgia General Assembly passed Act No. 53 (H.B. 244 of the 2005 Regular Session), which amended a num-

---

**2.** The Court agrees that said statutory provisions establish that jurisdiction is proper in this Court. The Court also recognizes that the issue set forth herein rests upon the contingency of an August 21, 2012 runoff election being held in Georgia. As discussed below, the Court finds that there is a substantial likelihood of said contingency occurring; therefore, the present case is justiciable. *Browning–Ferris Indus. of Ala. Inc. v. Ala. Dept.of Envtl. Mgmt.,* 799 F.2d 1473, 1478 (11th Cir.1986) ("It is clear that in some instances a declaratory judgment is proper even though there are future contingencies that will determine whether a controversy ever actually becomes real. . . . [T]he practical likelihood that the contingencies will occur and that the controversy is a real one should be decisive in determining whether an actual controversy exists.").

**3.** This provision of UOCAVA applies to all absentee ballot requests received by the state at least forty-five days prior to the election. For all requests received less than forty-five days prior to the election, the state must transmit the absentee ballot in accordance with state law and if practicable, "in a manner that expedites the transmission of such absentee ballot." 42 U.S.C. § 1973ff–1(a)(8)(B).

ber of sections of Georgia's Election Code. This Act, signed into law on April 22, 2005, included provisions designed to ensure long-term compliance with UOCAVA by Georgia and its counties [Doc. No: 2–3, p. 7]. The United States and Georgia also entered into a Memorandum of Understanding (containing various provisions and reporting requirements) ("the Memorandum") that was annexed to the stipulation and order of dismissal of the 2004 civil action [Doc. No. 2–3, pp. 2–14]. The Memorandum and the amended statutory law provided for the creation of a state write-in absentee ballot for federal and statewide offices [*id.*]

The Memorandum's reporting requirements expired in 2008. In 2009, Congress passed the MOVE Act, requiring states to transmit absentee ballots to UOCAVA voters at least forty-five days before an election for federal office. 42 U.S.C. § 1973ff–1(a)(8)(A). In 2010 and 2012, Georgia's General Assembly passed UOCAVA related legislation; however, Georgia has not passed legislation that provides for a forty-five day transmittal period for official absentee primary runoff ballots [Doc. Nos. 8–6; 8–11].

UOCAVA also requires a state to establish a written plan that provides for absentee ballots to be made available to UOCAVA voters in a manner that gives them sufficient time to vote in the runoff election. 42 U.S.C. § 1973ff–1(a)(9). The United States requested Georgia's plan after the March 6, 2012 Presidential Preference Primary [Doc. No. 8, p. 10]. Pursuant to the parties' agreement, Georgia provided said plan on April 20, 2012.

Under Georgia law, an official runoff absentee ballot is transmitted to a UOCAVA voter "as soon as possible prior to a runoff." O.C.G.A. § 21–2–384(a)(2). Pursuant to Georgia's UOCAVA runoff voting plan, Georgia has made provisions for both mail and electronic delivery of official absentee ballots [Doc. No. 2–2, p. 3]. If a UOCAVA voter chooses to receive a ballot by mail, a State Write-in Ballot ("SWAB") is automatically included with each official absentee ballot mailed to a UOCAVA voter for the initial election preceding the corresponding runoff election [*id.*]. The mailing with the SWAB does not include a certified list of runoff candidates [*id.*]. The mailing notifies UOCAVA voters that in the event of a runoff, they will be able to electronically access the appropriate ballot and instructions once the official ballots have been prepared and made available [Doc. No. 8–4, p. 2]. Georgia's written plan further provides that the UOCAVA voter may choose among a SWAB, Federal Write-in Ballot ("FWAB"),[4] or the official absentee ballot, to vote in the federal runoff election [Doc. No. 2–2, p. 3]. In addition, Georgia allows a UOCAVA voter who submits a write-in ballot and later receives an official absentee ballot to also submit the official absentee ballot; however, the voter "should make every reasonable effort to inform the appropriate board of registrars that [he or she] has submitted more than one ballot" [*id.* at p. 4]. Voted ballots may only be returned by mail [*id.*].

Georgia has also submitted exhibits showing that its Secretary of State's internet homepage has been updated to include a special icon for UOCAVA voters [Doc. Nos. 8–7; 8–8]. This icon links to a page

---

**4.** As stated in Georgia's written plan, "[o]n both the FWAB and SWAB, a voter may write in the name of a candidate or candidates for state offices that are elected on a statewide basis and for all federal offices in a runoff election. On the FWAB, the elector has the option of designating a candidate by writing in a party preference for each office, the names of specific candidates for each office, or the name of the person who the elector prefers for each office" [Doc. No. 2–2, p. 4].

containing information and forms necessary for UOCAVA voters to register and request absentee ballots, as well as specific contact information for the designated UOCAVA representative for each Georgia county's elections office [Doc. No. 8–8].

On July 31, 2012, the State of Georgia will hold federal primary elections (for its delegation to the United States House of Representatives) [Doc. No. 8–2, p. 2]. In the event that a candidate fails to receive a majority of the votes cast, Georgia will conduct any necessary primary runoff election twenty-one days thereafter, on August 21, 2012 [Doc. No. 8–2]. *See* O.C.G.A. § 21–2–501(a). Under the forty-five day transmittal time period of UOCAVA, Georgia must transmit its official primary runoff election ballots by July 7, 2012; however, Georgia will be unable to do so, as its primary is scheduled for a later date, July 31, 2012. In essence, Georgia will not know on July 7, 2012 if a runoff election will be required. And it appears that there is a possibility for a runoff in the six Georgia Congressional Districts in which there are three or more candidates from the same party running for a single seat—specifically, Districts 2, 3, 4, 9, 11, and 12 [Doc. No. 2–2].

Georgia notes that its Secretary of State "expects to be able to post the unofficial results [of the July 31, 2012 election] within less than one day after the election" [Doc. No. 8, p. 9]. By law, the Secretary of State thereafter has a period of up to fourteen days to certify election results. O.C.GA. § 21–2–499(b). However, the State indicates that official results are "generally" certified within a day after receipt of the certified results from the county election officials—said receipt must occur by 5 p.m. on the Monday following the election [Doc. No. 8, p. 9]. O.C.G.A. § 21–2–493(k). In accordance with the general practice, it appears that August 7, 2012 is the earliest date that the official list of runoff candidates will be posted and the official runoff absentee ballots can be mailed.

Georgia law also provides that runoff absentee ballots from overseas voters must be postmarked by the date of the election and received within the three day period following the runoff in order to be counted and included in certified election results. O.C.G.A. § 21–2–386(a)(1)(G). Thus, the deadline for receipt for absentee ballots in the runoff election, as currently scheduled, is August 24, 2012.

On June 27, 2012, the United States filed a Motion for Temporary Retraining Order ("TRO") and Preliminary Injunction, asserting that emergency relief is necessary to remedy the imminent deprivation of the right to vote as guaranteed under UOCAVA because of Georgia's failure to ensure the transmission of absentee ballots to qualified UOCAVA voters at least forty-five days before the State's August 21, 2012 federal primary runoff election. At issue is whether the State of Georgia's federal primary runoff scheme complies with the requirements of UOCAVA and if not, what remedial relief may be ordered to preserve the statutory rights of the UOCAVA voters.

The Court held a hearing on the matter on July 3, 2012 ("the Hearing").

## II. Legal Standard

The Court considers four factors when deciding whether to issue a TRO or preliminary injunction pursuant to Federal Rule of Civil Procedure 65: (1) whether there is a substantial likelihood of success on the merits; (2) whether the TRO or preliminary injunction is necessary to prevent irreparable injury; (3) whether the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant; and (4) whether the TRO or preliminary injunction would

be adverse to the public interest. *Parker v. State Bd. of Pardons and Paroles*, 275 F.3d 1032, 1034–1035 (11th Cir.2001). Injunctive relief is an extraordinary and drastic remedy and should not be granted unless the movant clearly establishes the burden of persuasion as to each of these four factors. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir.2000). The decision to grant preliminary injunctive relief is within the broad discretion of the district court. *Majd–Pour v. Georgiana Cmty. Hosp., Inc.*, 724 F.2d 901 (11th Cir.1984).

## III. Legal Analysis

### A. Likelihood of Success on the Merits

■ The first factor when determining whether to issue temporary or preliminary injunctive relief is whether the movant has a substantial likelihood of success on the merits. *Parker*, 275 F.3d at 1035. In this case, the United States has a substantial likelihood of succeeding on the merits of its claim that Georgia will violate 42 U.S.C. § 1973ff–1(a)(8)(A) by failing to timely transmit either the official absentee ballots, or the SWAB along with a list of necessary candidate information, to UOCAVA voters who wish to vote in the event of a primary runoff election on August 21, 2012 [Doc. No. 1, ¶ 21].

UOCAVA, *inter alia*, requires each State to "transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter … in the case in which the request is received at least 45 days before an election for Federal office, not later than 45 days before the election…." 42 U.S.C. § 1973ff–1(a)(8)(A). At the Hearing, Georgia conceded that section 1973ff–1(a)(8)(A)'s forty-five day deadline applies to runoff elections. Given Georgia's election schedule, the official absentee ballot necessarily will be transmitted less than forty-five days before the primary runoff election. Geor-

gia instead attempts to comply with section 1973ff–1(a)(8)(A) by transmitting the SWAB at least forty-five days before the runoff date and making the names of runoff candidates available no earlier than twenty-one days before the runoff. Thus, the United States' likelihood of success on its claim depends on whether Georgia can satisfy section 1973ff–1(a)(8)(A) by transmitting a SWAB, and only a SWAB, by the forty-five day deadline.

Although UOCAVA does not explicitly discuss state write-in absentee ballots (e.g., the SWAB), the statute does provide for the FWAB. 42 U.S.C. § 1973ff–2. While there are minor differences between the SWAB and the FWAB, they share one key and fundamental similarity: they are, by definition, write-in ballots that do not list the candidates for whom votes can be placed; instead, voters must obtain candidate lists from other sources, and then write in the candidates' names on the blank ballots. *See, e.g.*, Ga. Sec'y of State, *Special Write-in Absentee Ballot* (2012), *available at* http://www.sos.ga.gov/elections/elections/voter_information/2–1–REP–FBSWAB.pdf; Dep't of Def. Fed. Voting Assistance Program, *Federal Write-in Absentee Ballot* (2012), *available at* http://www.fvap.gov/resources/media/fwab.pdf.

At least one court has found that the FWAB is a fail-safe that cannot substitute for timely transmission of an official state absentee ballot. *United States v. Cunningham*, No. 08–cv–709, 2009 WL 3350028, at *8 (E.D.Va. Oct. 15, 2009); *see also* 156 Cong. Rec. S4513, 4519 (daily ed. May 27, 2010) (statement of Sen. Charles Schumer). The reasoning behind the holding in *Cunningham* applies with equal force to the SWAB. Among the FWAB's deficiencies discussed in Cunningham, the court focused on Congress's statement that the FWAB " 'is intended as an emer-

gency back-up measure rather than as a replacement for the regular ballot,' " *id.* (citing H.R. Rep. 99–765, at 14 (1986), 1986 U.S.C.C.A.N. 2009, 2018), and "the fact that regular absentee ballots list all offices, names, party affiliations, and ballot propositions, while the [FWAB] is blank and requires voters to be able to make choices based on complete and advance knowledge of their jurisdiction's ballot." *Cunningham,* 2009 WL 3350028, at *8; see also 42 U.S.C. § 1973ff–2(a)(2)(A) (stating that the FWAB is merely a "backup measure to vote in election for Federal office"). Like the FWAB, the SWAB is merely an emergency measure that is no substitute for Georgia's official absentee ballot for the primary runoff election. Indeed, the blank nature of the SWAB requires voters to have advance and separate knowledge of the runoff election in order to successfully fill out the SWAB and vote. *See, e.g.,* Ga. Sec'y of State, Special Write-in Absentee Ballot (2012), available at http://www.sos.ga.gov/elections/elections/voter_information/2-1-REP-FBSWAB.pdf.

Georgia, in fact, concedes that the SWAB cannot be completed without the "necessary candidate information" that is transmitted only weeks before the runoff [Doc. No. 8, p. 12]. Accordingly, the SWAB is merely a partial ballot, the timely transmission of which cannot fulfill UOCAVA's forty-five deadline for transmitting a ballot.[5]

The partial and deficient nature of the SWAB is readily apparent here. Georgia's dates for the primary and runoff elections leave insufficient time to provide all overseas voters with the advance and separate knowledge necessary for using the SWAB

and exercising their right to vote. The primary election will be held on July 31, 2012, and the runoff is scheduled for August 21, 2012 [Doc. No. 1, ¶ 8]. The counties must certify the primary election results by August 6, 2012, *see* O.C.G.A. § 21–2–493(k), after which, the Secretary of State can certify the results, which must be done by August, 14, 2012, *see* O.C.G.A. § 21–2–499. The best-case scenario is that the results are certified in mere hours and the official ballots are transmitted by August 1, 2012. Notably, Georgia did not argue that the results and official ballots could be processed so quickly. The United States asserts that the counties will use all of their allotted time to certify the results, and thus, that the official absentee ballots will be transmitted no earlier than August 7, 2012—two weeks before the election. Of course, the worst-case scenario is that the election will be certified on August 14, 2012, and the official absentee ballots will be transmitted less than a week before the election.

Georgia has two official methods for informing its overseas voters about runoff elections and the names of the runoff candidates: (1) listing the information on the Secretary of State's website, and (2) communicating the information through the official primary runoff absentee ballots, which are transmitted via the voters' preferred channels of communication [Doc. No. 2–2, p. 3]. *Cf.* 42 U.S.C. § 1973ff–1(f) (requiring states to transmit the ballots using the method requested by the voter, i.e. via mail or electronically). For those overseas voters who selected mail delivery, there is a distinct possibility that they will

---

5. At the Hearing, Georgia distinguished the SWAB from the FWAB because the SWAB is transmitted by the state—by mail and electronically—along with instructions that direct the voter to access the additional candidate information on the Secretary of State's website, whereas the FWAB is not transmitted by Georgia and does not instruct a voter on how to obtain candidate information. These differences, however, are of no legal consequence. The additional features of the SWAB do nothing to timely provide the voters with the *candidate* information necessary to complete the ballot.

be unable to vote in the runoff because they will not receive the candidate information until after the election. *See Cunningham*, 2009 WL 3350028, at *8 (finding that on average it takes seven to thirteen days to mail a ballot to Iraq, "not including the time it takes to reach a servicemember in the field," and in "some remote, austere locations, it may take as long as thirty-five days just for mail to [reach] that location ... before the servicemember can even open and read that mail, much less send response mail back to the United States") (internal quotation marks omitted). And even those voters who opted for electronic transmission would likely have to wait until August 7, 2012 to learn the official results and use the SWAB—leaving fourteen days to vote rather than the forty-five days required by UOCAVA. Thus, the SWAB is deficient, despite Georgia's measures for providing the necessary candidate information.

Georgia makes a series of counter-arguments, but prime among them is Georgia's attempt to frame the issue in terms of UOCAVA's requirement that "the States ... establish a written plan that provides absentee ballots are made available to absent uniformed services voters and overseas voters in [a] manner that gives them sufficient time to vote in the runoff election." 42 U.S.C.A. § 1973ff–1(a)(9). Georgia secondarily argues that under the plain language of 1973ff–1(a)(8)(A), transmitting the SWAB alone satisfies the forty-five day deadline.

First, the "sufficient time" requirement in section 1973ff–1(a)(9) is not a carve-out from the forty-five day requirement in section 1973ff–1(a)(8)(A). FVAP, *Guidance on Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) Ballot Delivery Waivers*, App. A, p. 1 (Feb. 7, 2012) *available at* http://www.fvap.gov/resources/media/2012_waiver_guidance.pdf ("States and localities are required to

transmit absentee ballots 45 days prior to any election for Federal office, which includes all general, special, primary (including Presidential preference primaries) and run-off elections."). Indeed, Georgia essentially conceded this point at the Hearing, admitting that the forty-five day requirement applies to runoff ballots. Even if there is a "sufficient time" carve-out, it would not be met by Georgia's measures: it is unlikely that the runoff candidate information can be transmitted to servicemembers by mail before the election.

Second, Georgia argues that because the plain language of section 1973ff–1(a)(8)(A) does not distinguish between official ballots and write-in ballots (i.e., SWABs and FWABs), the forty-five day deadline can be met by transmitting the SWAB alone. However, such a reading of the subsection leads to an unreasonable result that largely nullifies UOCAVA's core purpose.

■ Although the plain language rule generally requires a court to enforce a statute's plain and unambiguous terms, a court can look beyond the plain language in order to avoid an "absurd result." *See, e.g., United States v. Granderson*, 511 U.S. 39, 47 n. 5, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994) (avoiding an interpretation that led to an absurd result). In that vein, "[g]eneral terms should be ... limited in their application as not to lead to injustice, oppression, or an absurd consequence." *United States v. Kirby*, 74 U.S. 482, 486, 7 Wall. 482, 19 L.Ed. 278 (1868). Here, the forty-five day deadline in section 1973ff–1(a)(8)(A) applies to an "absentee ballot"— a plain and general term. But there must be some threshold requirements for what constitutes an "absentee ballot," lest the term be stretched into the realm of injustice and produce an "absurd result." Indeed, Georgia's plain meaning reading of the statute has no limiting principle: it would allow a state to send a ballot that is

nothing more than a blank sheet of paper to UOCAVA voters for any election (never communicating the candidate information) and still comply with section 1973ff–1(a)(8)(A). This would lead to the injustice of depriving UOCAVA voters of their right to vote, and the "absurd result" of allowing the States to comply with the letter of UOCAVA and yet frustrate the purpose of the law. *See* 156 Cong. Rec. S4513 (daily ed. May 27, 2010) (explaining Congress's intent "to protect the voting rights of American Citizens, ... especially ... those very individuals who are sworn to defend that freedom are unable to exercise their right to vote").

Ultimately, the United States has a substantial likelihood of prevailing on the merits of its UOCAVA claim. The Attorney General has the authority to bring this action for injunctive relief in the event that Georgia violates UOCAVA. Under Georgia's current election scheme, the candidates for a primary runoff election will be determined less than forty-five days before the runoff; thus, the State attempts to comply with section 1973ff–1(a)(8)(A)'s forty-five day deadline by transmitting SWABs alone. But the SWAB alone cannot satisfy section 1973ff–1(a)(8)(A). Thus, in the event of a primary runoff election, it is beyond dispute that Georgia will violate section 1973ff–1(a)(8)(A), and the United States will almost certainly succeed on the merits of its claim.

## B. Probability of Irreparable Injury

To succeed under the second factor, the United States must show "a substantial likelihood of irreparable injury" in the absence of a preliminary injunction. *Siegel*, 234 F.3d at 1176. Here, the asserted injury is that UOCAVA voters will be denied their statutory rights in the event of a primary runoff election. This Court, thus, is presented with two questions: (1) is a primary runoff substantially likely to occur, and (2) would violation of 42 U.S.C.A.

§ 1973ff–1(a)(8) constitute an irreparable harm?

■ First, to show a substantial likelihood, "the asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" *Id.* (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 896 F.2d 1283, 1285 (11th Cir.1990)). Here, primary runoff elections are substantially likely to occur in six Georgia Districts. Georgia law provides that a runoff will take place if no candidate in a primary receives a majority of the votes cast. O.C.G.A. § 21–2–501(a). There are three or more candidates of the same political party running in the primaries of six districts: the Second, Third, Fourth, Ninth, Eleventh, and Twelfth Districts [Doc. No. 8–9, 2–5]. As a result, this Court finds that, with respect to the six districts named above, there is a substantial likelihood that no one candidate will receive a majority of the votes, thus resulting in a primary runoff.

Second, an irreparable harm occurs when a UOCAVA voter is denied the right to receive a sufficient absentee ballot at least forty-five days before the primary runoff election. The Supreme Court has consistently recognized that the right to vote is essential to the United States' form of government. *See, e.g., Bartlett v. Strickland*, 556 U.S. 1, 10, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009) (holding that the right to vote is "fundamental"); *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (recognizing the right of voters "to cast their votes effectively," which "of course, rank[s] among our most precious freedoms"). The harm at issue in this case is a violation of UOCAVA's forty-five day deadline that protects the franchise of United States citizens overseas; the failure to comply with that deadline is an irreparable harm. *See United States v.*

*Alabama,* 857 F.Supp.2d 1236, 1240–41 (M.D.Ala.2012); *see also Marchant v. N.Y. City Bd. of Elections,* 815 F.Supp.2d 568, 578 (E.D.N.Y.2011) (citing *Williams v. Salerno,* 792 F.2d 323, 326 (2d Cir.1986) (holding that an "infringement on the right to vote necessarily causes irreparable harm")).

Because primary runoffs are substantially likely to occur in six districts, and Georgia will necessarily fail to timely transmit the official absentee ballots within the forty-five day timeline guaranteed by UOCAVA, this Court finds that there is "a substantial likelihood of irreparable injury." *Siegel,* 234 F.3d at 1176.

## C. Balance of Harms

The third factor to consider when determining whether to issue a temporary restraining order or preliminary injunction is whether the threatened injury to the movant outweighs the hardship that would be experienced by the opposing party if the temporary restraining order or preliminary injunction were issued. *Parker,* 275 F.3d at 1035. The injunctive relief requested by the United States involves extending the ballot receipt deadline, providing alternative methods for delivery and receipt of official ballots from UOCAVA voters, engaging in a public awareness campaign through direct notice and use of certain media, and transmitting mailed ballots by express delivery services. Imposition of the proposed relief might result in three discrete classes of hardship.[6] The first class is monetary capital. Certain provisions in the proposed remedy would create costs that would have to be borne by Georgia. The second class of hardship is human capital. In order to ensure compli-ance with the injunction, Georgia election officials would need to divert time and energy away from those tasks that they would normally perform. The third class of hardship is the delay caused by extending the receipt deadline for UOCAVA voters in the runoff election. This delay could potentially make it more difficult for Georgia to timely prepare and distribute materials for the general election, currently scheduled for November 6, 2012. Indeed, during oral arguments, Georgia articulated a concern that the imposition of a deadline extension for the receipt of ballots for the runoff election would cause substantial hardship in preparing ballots for the general election.

▮ The question that must be answered is whether the hardships that Georgia could experience are outweighed by the threatened injury to UOCAVA voters. "The right to vote is 'a fundamental political right.'" *United States v. Cunningham,* No. 3:08–cv–709, 2009 WL 3350028, at *4 (E.D.Va. Oct. 15, 2009) (quoting *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). No right is more precious than the right to vote; even the most basic of other rights are illusory if the right to vote is undermined. *Id.* (citing *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964)). "For our citizens overseas, voting by absentee ballot may be the only practical means to exercise [their right to vote]. For the members of our military, the absentee ballot is a cherished mechanism to voice their political opinion." *Id.* (quoting *Bush v. Hillsborough Cnty. Canvassing Bd.,* 123 F.Supp.2d 1305, 1307 (N.D.Fla. 2000)). "Given that how and where our

---

**6.** Georgia did not identify any particular hardships in its Response Brief, [Doc. No. 8], but during oral argument, it did identify a concern that delays may result if the requested remedy were issued. That concern is not-ed in the third class of hardships. The Court then contemplated the other two classes of hardships that would likely result from the issuance of the remedy requested by the United States.

servicemembers conduct their lives is dictated by the government, their right to vote is 'their last vestige of expression and should be provided no matter what their location.'" *Id.* (quoting *Bush,* 123 F.Supp.2d at 1307). Indeed, Congress introduced the MOVE Act because our legislators were alarmed by the fact that active military members, their families, and thousands of other American citizens who were overseas could not cast a ballot while they served our country or lived overseas. 156 Cong. Rec. S4513, 4514 (daily ed. May 27, 2010) (statement of Sen. Charles Schumer).

Here, the Court finds that the hardships that Georgia might experience are substantially outweighed by the threatened injury to UOCAVA voters. Georgia's absence of a forty-five day ballot transmittal time period for its runoff absentee voting scheme jeopardizes the fundamental right to vote of UOCAVA voters. The potential hardships that Georgia might experience are minor when balanced against the right to vote, a right that is essential to an effective democracy. In fact, the hardships that Georgia might suffer are minimized by the fact that the requested remedy is tailored to this particular circumstance. The requested remedy only applies to those six congressional districts in which there is a likelihood of a runoff election. Many of the facets of the proposed remedy only trigger if there actually is a runoff election. In addition, the proposed remedy will allow the runoff election results to be certified without delay if the outstanding absentee votes could not mathematically affect the outcome. Additionally, the United States has proposed a tailored remedy that substantially increases the opportunity for UOCAVA voters to receive and return their ballots in a manner that more closely approximates the UOCAVA forty-five day ballot transmittal window.

Ultimately, Georgia's potential harm amounts to expenditures of time and money that will be incurred in performing UOCAVA remedial tasks, as well as the inconvenience that Georgia election officials might experience in having to expedite the process of ballot preparation for the general elections if primary runoffs take place in the six Congressional Districts at issue. Significantly, the United States noted during oral argument that Georgia has experience enacting many of the measures that the United States has requested in its proposed remedy. Specifically, the United States notes that in 2004, Georgia was required to send out notices to voters that were affected by the injunctive relief granted in that case, and was also required to allow those voters to transmit their votes electronically [Doc. No. 2–2, pp. 23–26]. The fact that Georgia was capable of enacting these measures speaks to those measures being reasonable. In weighing the threatened injury to UOCAVA voters against the hardships that Georgia might suffer if the requested remedy were granted, the Court finds that the potential deprivation of the ability to vote, the most basic of American citizens' rights, outweighs the cost and inconvenience that might be suffered by Georgia as a result of its present primary runoff election scheme which does not comply with the forty-five day UOCAVA transmittal requirements. *See United States v. Alabama,* 857 F.Supp.2d 1236, 1242 (M.D.Ala. 2012) (holding that the potential harm caused to UOCAVA voters far outweighed the burden placed upon the State, because of the State's legally mandated obligation to provide UOCAVA voters the ability to vote).

**D. Public Interest**

Finally, the requested preliminary injunction would not be adverse to the public interest. The very nature of a statute

such as UOCAVA evinces Congress's strong desire to protect the integrity of the democratic process. *See, e.g.,* 156 Cong. Rec. S4513, 4514 (daily ed. May 27, 2010) (statement of Sen. Charles Schumer) ("Congress has a compelling interest to protect the voting rights of American citizens, and it is especially incumbent upon Congress to act when those very individuals who are sworn to defend that freedom are unable to exercise their right to vote."). Congress has recognized that the public is benefitted when voting rights are enforced. *See Torres v. Sachs,* 69 F.R.D. 343, 347 (S.D.N.Y.1975) (construing 42 U.S.C. § 1973l(e)). Indeed, "[n]othing is more critical to a vibrant democratic society than citizen participation in government through the act of voting. It is unconscionable to send men and women overseas to preserve our democracy while simultaneously disenfranchising them while they are gone." *United States v. New York,* No. 1:10–cv–1214, 2012 WL 254263, at *1 (N.D.N.Y. Jan. 27, 2012). Thus, there is no question that the requested preliminary injunction is not adverse to the public interest.

## IV. Injunctive Relief

Accordingly, the United States has shown that it is entitled to temporary and preliminary injunctive relief because (1) there is a substantial likelihood of success on the merits on the UOCAVA claim, (2) the TRO and preliminary injunction is necessary to prevent irreparable injury caused by the violation of a voter's UOCAVA rights, (3) the threatened injury outweighs the harm that the TRO and preliminary injunction would cause to Defendants, and (4) the TRO and preliminary injunction would not be adverse to the public interest. *See Parker v. State Bd. of Pardons and Paroles,* 275 F.3d 1032, 1034–1035 (11th Cir.2001). Because little time remains before Georgia's anticipated federal primary runoff election, and

in order to afford relief as complete and narrowly-tailored as practicable, it is ORDERED as follows:

(1) *Extension of ballot receipt deadline for primary runoff election.* As to the August 21, 2012 federal primary runoff election, *if held,* the deadline for receipt of ballots from UOCAVA voters registered in United States Congressional Districts 2, 3, 4, 9, 11, and 12 is extended by seven days, until August 31, 2012. As to said specific UOCAVA voters, Defendants shall take all steps necessary to ensure that all timely requested UOCAVA ballots, including Federal and State Write-in Absentee Ballots, are counted as validly cast ballots in the August 21, 2012 federal primary runoff election, provided such ballots are executed and sent by 7:00 p.m. EDT on August 21, 2012, are received by August 31, 2012, and are otherwise valid. Certification of the runoff election results should not generally occur until after August 31, 2012; however, a federal primary runoff election may be formally certified in accordance with the schedule provided in Georgia law for any election in which the number of outstanding absentee ballots from UOCAVA voters (registered in the above-stated Congressional Districts) could not mathematically alter the outcome of the election, subject to amendment or recertification to add any votes from any valid ballots returned by the extended receipt deadline.

(2) *Website posting of official election results and notice.* Defendants shall post on the State's election information website official results of the July 31, 2012 federal primary election as soon as they become available. By no later than July 12, 2012, Defendants shall send (in the UOCAVA voter's preferred method of transmittal) a link or website address to all UOCAVA voters registered in United States Congressional Districts 2,

3, 4, 9, 11, and 12. At that time, Defendants also shall inform said UOCAVA voters of their right to request and receive by email, fax, or download from the Secretary of State's website: (1) a SWAB (if they have not already received a SWAB by mail) and necessary runoff candidate information or (2) their official absentee ballot for the runoff election, *if held.*

(3) *Outgoing express ballot transmission.* As soon as possible prior to the August 21, 2012 federal primary runoff election, if held, Defendants shall send by express delivery service an official absentee ballot to any UOCAVA voters registered in United States Congressional Districts 2, 3, 4, 9, 11, and 12, who requested to receive their ballot by mail, and who is registered to vote in a district in which a runoff will be held.

(4) *Electronic and express ballot return and notice.* Defendants shall provide all UOCAVA voters, registered in United States Congressional Districts 2, 3, 4, 9 11, and 12, and eligible to vote in the August 21, 2012 primary runoff election, *if held,* with the option of returning their ballot by email, fax, or express delivery service at no cost to the voter. Defendants shall instruct each UOCAVA voter (registered in said districts) on how to exercise these return options by no later than July 12, 2012.

(5) *Ballot counting procedures and notice.* To ensure that UOCAVA voters (registered in United States Congressional Districts 2, 3, 4, 9, 11, and 12 and who will possibly receive two ballots (i.e., a State write-in ballot and/or an official absentee ballot and/or two or more official ballots via the alternative forms of delivery, set out above)) will have their ballot validly counted, Defendants shall notify all UOCAVA voters, registered in United States Congressional Districts 2, 3, 4, 9, 11, and 12, of the provisions of Georgia law, O.C.G.A. § 21–2–381.2(f),

which provides that in the event that both the regular absentee ballot and the state write-in ballot are received by the registrars within the time period for receiving absentee ballots, the regular absentee ballot shall be counted and the state write-in ballot shall be kept unopened. Defendants shall also establish a procedure for determining which ballot shall be counted in the event that two or more official ballots are returned by the UOCAVA voter and similarly notify UOCAVA voters registered in the above-stated Congressional Districts of said counting procedure.

(6) *Training of county election officials.* Defendants shall provide guidance and training to county election officials (responsible for overseeing elections in United States Congressional Districts 2, 3, 4, 9 11, and 12) regarding all relief being imposed under this Order, to enable them to take any action necessary for its implementation.

(7) *Coordination with FVAP on notice.* Upon entry of this Order, Defendants shall notify the Director of the Federal Voting Assistance Program of the United States Department of Defense ("FVAP") and request assistance in notifying military and other eligible voters of the relief afforded by this agreement, and coordinate with FVAP as necessary to facilitate such notice.

(8) *Press statement notice.* Upon entry of this Order, Defendants shall take the following steps to endeavor to give affected UOCAVA voters (registered in United States Congressional Districts 2, 3, 4, 9, 11, and 12) notice of its contents:

(a) issue a press statement for immediate release. The press statement shall, at a *minimum*

(1) summarize this order, including a notice that the deadline for receipt of *runoff* election ballots has been extended;

(2) notify UOCAVA voters (registered in United States Congressional Districts 2, 3, 4, 9, 11, and 12) that they may choose to receive their ballots for the August 21, 2012 federal primary runoff election, *if held,* by fax or email and return them by fax or email or express delivery service at no cost to the voter; and

(3) provide appropriate contact information for the Secretary of State's office. Defendants shall also prepare and distribute written public service announcements describing this Order for broadcast on radio and television networks, including but not limited to the media described above.

(b) immediately post said press statement on the State's election information website, and distribute said press statement as broadly and immediately as practicable to national and local wire services, to radio and television broadcast stations, and to daily newspapers of general circulation in the State.

(c) further distribute said press statement to the FVAP; International Herald Tribune (http:/www.iht.com); USA Today International (http://www.usatoday.com); Military Times Media Group (cvinch@militarytimes.com); Overseas Vote Foundation (http://www.overseasvotefoundation.org/intro/); Stars and Stripes (www.estripes.com), and any other appropriate newspaper or news media in the State of Georgia.

(9) *Reporting on absentee ballots.* Defendants shall also provide a report to counsel of record for the United States no later than September 14, 2012, concerning the number of UOCAVA absentee ballots, by county, received and counted, and the means by which each ballot was received, for the August 21, 2012 federal primary runoff election, *if held.* The report will set forth the following information, by county, in a format agreed upon by the parties, categorized by absent uniformed services voters with APO/FPO addresses or non-U.S. street addresses; uniformed services voters at a street address within the U.S.; and overseas civilian voters:

(a) the number of absentee ballots from UOCAVA voters received and counted by counties through August 24, 2012;

(b) the number of absentee ballots from UOCAVA voters received and counted after August 24, 2012 but prior to the close of business on the date of the extended receipt deadline (August 31, 2012);

(c) the number of absentee ballots from UOCAVA voters received later than the close of business on the date of the extended receipt deadline (August 31, 2012) for all of the counties holding a runoff election; and

(d) the number of absentee ballots from UOCAVA voters that were not counted in the August 21, 2012 federal primary runoff election for reasons other than late receipt, and the reasons such ballots were not counted.

(10) *Records retention.* Defendants shall maintain written records of all actions taken pursuant to this Order sufficient to document compliance with its terms. Such records shall be made available to the United States upon request.

## V. Additional relief: reporting requirement as to the July 31, 2012 primary election

At the conclusion of the July 3, 2012 hearing, counsel for the United States indicated, as noted in its brief, that the United

States is still awaiting confirmation from the State of Georgia as to whether UOCAVA ballots were transmitted by the June 16, 2012, 45-day transmittal deadline, for the July 31, 2012 primary election. In response to said inquiry, Georgia provided general draft estimates. The Court orders that final figures be provided by the State of Georgia to the United States by Monday, July 9, 2012.

## VI.  Jurisdiction retained

The Court retains jurisdiction of this action to enter such further relief as may be necessary for the effectuation of the terms of this Order, and for the entry of such permanent relief as appropriate to ensure Georgia's future UOCAVA compliance.

## VII.  Conclusion

For the foregoing reasons, the Motion for Temporary Restraining Order and Preliminary Injunction [Doc. No. 2] filed by the United States of America is hereby GRANTED. Injunctive relief shall be as set forth herein.